**AMERICAN POSTAL WORKERS UNION, AFL–CIO, et al., Plaintiffs,**

v.

**UNITED STATES POSTAL SERVICE, et al., Defendants.**

**No. C–2–83–0195.**

United States District Court, S.D. Ohio, E.D.

Oct. 7, 1987.

Leonard S. Sigall, Reynoldsburg, Ohio, for plaintiffs.

Arnold S. White, Columbus, Ohio, for plaintiff Gloria Phillips.

Kevin B. Rachel, Sr. Atty., Office of Labor Law, Washington, D.C., D. Michael Crites, U.S. Atty., Albert R. Ritcher, Asst. U.S. Atty., Columbus, Ohio, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

GRAHAM, District Judge.

### FINDINGS OF FACT

1. This action is brought by the Columbus Area Local of the American Postal

Workers Union (APWU) AFL–CIO, and certain of its officials, representing a class of employees at the Columbus Post Office who use lockers at that facility. The defendants are the United States Postal Service; Postmaster General, Preston R. Tish; Columbus Director of Mail Processing, Don Peterson; and Postal Inspector, Thomas Brulport. Plaintiffs claim that the defendants violated the Fourth Amendment rights of postal service employees by conducting a search of lockers at the Columbus Post Office. Previous rulings of the court have limited plaintiffs' claims to injunctive and declaratory relief.

2. During 1982, local postal management and the Postal Inspection Service received information which indicated that postal employees at the Columbus Post Office were selling and using drugs at the main post office facility. In October of 1982, the maintenance department discovered marijuana in the telephone compartment of an elevator. In the same month, an anonymous report came to the Inspection Service that cocaine was being used by postal employees during work hours. Postal managers reported that employees were complaining that they had been approached and asked if they were interested in purchasing drugs. The postal medical examiner reported that he had examined employees who appeared to be under the influence of intoxicants. During November, 1982, information was provided to inspectors that indicated that weapons were being carried by employees. Several bullets were found on the workroom floor. The absenteeism rate, number of assaults and error rates on mechanical equipment all increased during this period of time. APWU Local President, Krystal Cooper, had concluded that there was a drug abuse and drug trafficking problem and was concerned for the safety of the employees. Mr. Cooper provided postal management and the Inspection Service with the names of fourteen workers who were suspected of either using or dealing in controlled substances. Mr. Cooper urged management to take action to solve this problem and specifically suggested a locker search. One of the employees whose name appeared on the list supplied by Mr. Cooper was subsequently arrested by the Columbus Police Department for distribution of a controlled substance.

3. David W. Madden, inspector in charge of the Cincinnati Division of the Postal Inspection Service, concluded that a locker search should be conducted at the Columbus Post Office and assigned this responsibility to Inspector Thomas Brulport. The search was scheduled for January 15, 1983 beginning at 1:00 a.m. This time was selected because it was believed that the problem of drug use and drug trafficking was greatest on Tour 1, the 10:00 p.m. to 8:00 a.m. shift.

4. All employees who choose to have a locker are required to submit a completed and signed Postal Service Form 4943. The current version of this form, which was issued in 1973, includes the following notice, prominently displayed:

NOTICE

IN THE ASSIGNMENT OF THIS LOCKER THE UNDERSIGNED UNDERSTAND THAT:

1. The use by other than the person listed, or exchanging with another employee without authority of the issuing office, is prohibited.

2. Locker must be clean and presentable and is only for official use. A personal lock is not permitted.

3. Disciplinary action may be taken for noncompliance.

4. Locker is subject to inspection at any time by authorized personnel. (Part 643 PSM)

5. Upon separation or transfer, the locker key must be returned, or final check may be withheld.

Prior to 1973, the form did not contain an explicit warning that lockers were subject to search. Employees who were assigned their current lockers before 1973 would have completed the earlier version of the form. All of the named plaintiffs signed the 1973 version of the form. There was no evidence as to just how many employees

were assigned their current lockers before 1973 or how many of them, if any, were included in the search.

5. The postal service, the national APWU and the National Association of Letter Carriers, AFL–CIO, have been parties to successive collective bargaining agreements since the early 1970's. The agreement in effect at the time of the search was the national agreement for 1981–1984. This agreement covers approximately 90% of the employees at the Columbus Post Office, including all of the named plaintiffs herein. Another collective bargaining agreement covers employees known as mail handlers. All of these collective bargaining agreements contain provisions relating to locker inspections which are substantially identical and which provide as follows:

Inspection of Lockers

The Employer agrees that, except in matters where there is reasonable cause to suspect criminal activity, a steward or the employee should be given the opportunity to be present at any inspection of employees' lockers. For a general inspection where employees have had prior notification of at least a week, the above is not applicable.

6. Section 774.12 of the Postal Services Administrative Support Manual (ASM) provides as follows:

.12 Examinations and Inspections.

All USPS–owned or furnished property under the custody or control of the Postal Service, including that individually assigned to postal personnel, is for official use only. This property, and its contents, are at all times subject to examination and inspection by duly authorized postal officials in the discharge of their official duties. The Chief Postal Inspector, officers and heads of installations, and their designated representatives, are authorized to examine and inspect, as their duties may require, such USPS–owned or furnished property and its contents.

7. Prior to January 15, 1983, there had never been a large scale search of employee lockers at the Columbus Post Office.

The lockers provided to the employees contained built-in locks and the postal service retained a duplicate key to each locker. The lockers are designed so that an individual lock can also be used. Notwithstanding the prohibition contained in the current version of Form 4943, a small number of employees have installed individual locks on their lockers. Sixteen hundred and forty-seven lockers were searched and approximately six were fitted with individual locks.

8. Many employees keep personal items in their lockers, including purses, lunch boxes, brief cases, clothing, papers, photographs, medications, and personal hygiene products. Most employees keep their lockers locked.

9. Prior to January 15, 1983, the procedure used in opening a locker without an employee's consent was to post a written notice to clear out the locker indicating that it would be opened on a specific date if the user has not responded to the tour office by that date.

10. On the morning of January 15, 1983, Inspector Brulport assembled a team of postal inspectors to conduct the search. Keys to the lockers were furnished by postal management and distributed to the search teams. Brulport informed the inspectors that the purpose of the search was to locate illegal drugs, particularly marijuana, cocaine, and heroin, as well as weapons, alcoholic beverages, stolen mail, postal property and other contraband. Brulport further instructed the inspectors that closed containers such as purses and briefcases should not be searched. Brulport made arrangements with the Columbus Police Department for the assistance of a drug detecting dog and its handler. Arrangements were made for five union stewards to accompany each of the five search teams while the lockers were being searched.

11. The locker search began at approximately 1:00 a.m. and continued until approximately 6:00 a.m. When personal locks were encountered, they were cut or broken by postal maintenance employees. It was originally planned to search all em-

ployee lockers, which number over 2,000; however, the inspectors ran out of time and ended the search after 1,647 lockers had been opened. The drug detecting dog tired after sniffing approximately one-third of the lockers and he was removed from the building. Before leaving, the dog did alert on four lockers and these were sealed until search warrants were obtained from a United States Magistrate. When these lockers were subsequently opened, no drugs were found.

12. The locker searches were witnessed by union stewards. The inspectors did not open closed containers found inside the lockers. They did move the contents of lockers in order to look behind and under objects and they did "pat down" clothing but did not search pockets. Several items were seized during the course of the search including approximately 582 pieces of mail found in the locker assigned to Gloria Phillips. Three bottles of liquor were taken from three separate lockers. A file box containing records of a gambling enterprise was recovered from one locker, and postal property used in postal training courses was removed from another. Five vials of pills were removed from five separate lockers. The seizure of prescription medications was contrary to Inspector Brulport's instructions. Four of the five pill containers were turned in by one of the five search teams. The court concludes that either these individuals misunderstood Inspector Brulport's instructions or they had some specific reason for considering these particular pill containers to be suspicious. One of them was an Anacin bottle containing orange colored pills. The contents of the pill containers were not analyzed and they were ultimately returned to their owners.

## CONCLUSIONS OF LAW

1. Searches and seizures by government employers or supervisors of the private property of their employees are subject to the restraints of the Fourth Amendment. However, Fourth Amendment rights are implicated only if the conduct at issue infringes "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Within the work place context, employees may have a reasonable expectation of privacy against intrusions by their employers or law enforcement officers. *See, Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

2. "Public employees' expectations of privacy in their offices, desks and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor v. Ortega, supra* at ——, 107 S.Ct. at 1498. "The employee's expectation of privacy must be assessed in the context of the employment relation" and "the question of whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Id.*

3. Applicable postal regulations, as well as the express terms of locker assignment agreements and collective bargaining agreements, provide for nonconsensual inspection of employee lockers by post office personnel and negate the existence of a reasonable expectation of privacy. A warrantless search of the lockers of postal employees by postal inspectors which does not include a search of closed containers within the lockers does not violate the employees' Fourth Amendment rights. *See, United States v. Donato,* 269 F.Supp. 921, (E.D.Pa.) *aff'd* 379 F.2d 288 (3rd Cir.1967); *United States v. Bunkers,* 521 F.2d 1217 (9th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975); *Los Angeles Police Protective League v. Gates,* 579 F.Supp. 36, 44 (C.D.Cal.1984).

4. Post Office Form 4943 which is used in the assignment of lockers to postal employees is in the nature of a contract. This agreement specifically provides that the locker "is subject to inspection at any time by authorized personnel." The collective bargaining agreements entered into between the United States Postal Service and the unions representing postal employees

bind the employees to the terms of those agreements. Those agreements contain express provisions which provide for the search of employees' lockers without their consent. The plaintiffs herein, as parties to one or both of these contracts (locker assignment agreement or collective bargaining agreement) expressly waived any Fourth Amendment rights they might otherwise have in their assigned lockers and agreed to the kind of search which was conducted in this case.

■ 5. Individuals may effectively relinquish constitutional rights by signing agreements in connection with their employment. *See, Knopf v. Colby,* 509 F.2d 1362, 1370 (4th Cir.) *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975); *United States v. Bunkers,* 521 F.2d 1217, 1221 (9th Cir.) *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975); *United States v. Sanders,* 568 F.2d 1175 (5th Cir. 1978); *Cf. United States v. Brown,* 763 F.2d 984 (8th Cir.1985); *United States v. Jennings,* 724 F.2d 436 (5th Cir.1984); *Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946).

## MEMORANDUM OPINION

There was substantial justification for concern on the part of the postal service that a problem of drug use and drug trafficking existed among the employees at the Columbus post office in the fall of 1982. Although there was no basis for an individualized suspicion that the locker of any particular employee might contain evidence of criminal acts or violation of postal regulations, there was a reasonable basis to believe that a general search of employee lockers would disclose such evidence.

The determinative issue in this case is the question of whether or not the employees had a reasonable expectation of privacy in their lockers. A closely related question is the one of whether or not the employees expressly waived any Fourth Amendment rights they may have had with respect to searches of their lockers. The court has found that the employees did not have a reasonable expectation of privacy in their lockers. This conclusion is based upon the applicable postal regulation and the very clear terms of the locker assignment agreement and the collective bargaining agreements entered into between the postal service and the unions representing the various postal employees.

■ The locker assignment form, Postal Service Form 4943, clearly provides that the locker is subject to inspection at any time by authorized personnel. Since 1973, every employee who has received a locker has signed such a form. The provisions of the collective bargaining agreements are equally clear. These agreements specifically recognize the employer's right to search an employee's locker while providing certain limitations which would not otherwise exist under the applicable postal regulations or the terms of the locker assignment agreement. In this respect, the collective bargaining agreement provides that except in matters where there is reasonable cause to suspect criminal activity, a steward or the employee should be given the opportunity to be present at any inspection of an employee's locker. Thus the employer may search a locker when there is reasonable cause to suspect criminal activity or when a steward or the employee is given the opportunity to be present. There is no requirement that the employee be notified of such a search or that he or she consent to such if either of those conditions are met. Here, arguably, both of those conditions were met. The court need not decide, however, whether or not the requirement of reasonable cause to suspect criminal activity must be on an individualized basis because in this case a steward was present for each of the searches. An employee who accepts the assignment of a locker and acknowledges in writing that it is subject to inspection at any time by authorized personnel and who is a party to a collective bargaining agreement which gives his employer the right to inspect his locker at any time and for any reason so long as a union steward is given the opportunity to be present, does not have a reasonable expectation of privacy in his or her locker. By the same token, such an employee has, by virtue of those same

documents, expressly waived any Fourth Amendment rights he or she may have in the assigned locker. This holding does not necessarily negate the existence of Fourth Amendment rights in closed containers kept within an assigned locker, such as luggage, purses, briefcases, etc. *See, O'Connor v. Ortega,* — U.S. —, —, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987).

The existence of regulations and contractual provisions permitting locker searches have been considered controlling by other courts which have addressed questions similar to that presented here. *See, United States v. Bunkers,* 521 F.2d 1217 (9th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975); *United States v. Donato,* 269 F.Supp. 921 (E.D.Pa.), *aff'd,* 379 F.2d 288 (3rd Cir.1967); *United States v. Grisby,* 335 F.2d 652 (4th Cir.1964) and *Los Angeles Police Protective League v. Gates,* 579 F.Supp. 36 (C.D.Cal.1984).

In its recent decision in *O'Connor v. Ortega, supra* at —, 107 S.Ct. at 1498, the Supreme Court recognized that public employees' expectations of privacy "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." The court specifically relied on the lack of such a policy or regulation in finding that the respondent had a reasonable expectation of privacy in his desk and file cabinets.

The postal service has a legitimate interest in securing and maintaining its right to inspect employee lockers which is rooted in the public interest in the protection of the safety of the mail and the need for the prevention and discovery of theft and destruction of posted items. Additional justification for such a requirement is the employer's interest in detecting the presence of drugs, alcohol, weapons, and other contraband which may pose a threat to employee safety and efficiency. The lockers are government property and are provided for the convenience of the employees. It is not unreasonable for the government to reserve the right to inspect such lockers. The exercise of that right was reasonable under the facts and circumstances of this case.

The right of the postal service to conduct locker searches is not affected by its failure to have exercised that right at the Columbus facility at any time prior to the search in question, nor is its right to do so diminished by the fact that a small number of employees attached personal locks to their lockers. The existence of six private locks on a group of approximately 1,650 lockers tends to establish wide-spread recognition of the policy against individual locks instead of the contrary.

The rights of the postal service to conduct locker inspections is not lost through lack of exercise of that right. Indeed, even though the right existed, one would not expect the postal service to exercise it on a large scale unless it had a reasonable basis for doing so. Apparently no such reason existed prior to the circumstances which led to the present search. Even though there was no precedent for such a search at the Columbus facility, such searches have occurred in other parts of the country and the right to conduct such searches has consistently been included in the locker assignment forms since 1973. In addition, the provision for such searches has been included in the collective bargaining agreements which are renewed periodically.

The Court finds the issues in favor of the defendants and final judgment is hereby rendered in favor of the defendants. The costs of this action are assessed against the plaintiffs.

It is so ORDERED.